**UNITED STATES of America**

v.

**John HOULIHAN, Allan Skinner, Jennie-rose Lynch, Michael Fitzgerald, Joseph Nardone, William Herd.**

**Crim. No. 93–10291–WGY.**

United States District Court,
D. Massachusetts.

Dec. 15, 1994.

---

*MEMORANDUM*

YOUNG, District Judge.

## I. BACKGROUND

In the early morning hours of Monday, March 2, 1992, James Boyden Jr. was found dead in the vicinity of Spice Street, Charlestown. He had been shot in the back of the head.

On the eve of trial involving federal charges arising out of this and other murders, attempted murders, and allegedly related misconduct, the government moved *in limine* for an Order permitting it to offer, through percipient witnesses, hearsay statements made by James Boyden Jr., James

Boyden Sr., and George Sargent, shortly before their respective murders. The Court declined to rule *in limine*, opting instead to await development of the trial record, making only such rulings as ultimately prove necessary and appropriate. Having now admitted one such statement of James Boyden Jr., and the government having withdrawn its proffer of the others, this memorandum addresses only the ruling already made. The admissibility of statements allegedly made by James Boyden Sr. and George Sargent will be addressed when and if necessary.

In its motion *in limine*, the government proffered the following evidence through counsel: Prior to his death, James Boyden Jr. allegedly told his sister, Marie Boyden Connors, that he had had a loud argument with the defendant Jennierose Lynch ("Lynch") in which she warned him that if he did not stop selling cocaine from her corner, she would have the defendant Michael Fitzgerald ("Fitzgerald") "blow [his] head off." James Boyden Jr. allegedly related similar accounts of this event to his mother, Veronica Boyden; his father, James Boyden Sr.; and another witness. His sister and mother each reported seeing him afterwards with a bandage on his face. Both women reported that James Boyden Jr. told them that Fitzgerald had beaten him up. The senior Mr. Boyden and another witness also reported that James Boyden Jr. had told them that he had been hit by Fitzgerald. On the evening before he was found dead, James Boyden Jr. was hanging out in his sister's Charlestown apartment drinking beer, departing at about 8:00 PM. As he was leaving, he allegedly told his sister that he was going out "to meet Billy Herd." William "Billy" Herd ("Herd") is a co-defendant in this case.

As the trial unfolded, the government abandoned its effort to admit most of these hearsay statements.[1] The government did,

---

1. In its motion *in limine,* the government argued that the hearsay statements of James Boyden Jr. are admissible because the declarant, James Boyden Jr., is dead and the defendants against whom the evidence is offered have waived their rights to object because inferentially they killed him, procuring his absence at trial. In support of this

proposition, the government cited a long line of cases which hold that a prior statement made by a witness rendered unavailable by "wrongful conduct" of a defendant is admissible against that defendant as long as the statement would have been admissible had the witness been able to testify at trial. *See Reynolds v. United States,*

98 U.S. 145, 25 L.Ed. 244 (1878) (where absence of witness procured though defendant's refusal to tell U.S. Marshal where witness could be found, hearsay statement admissible); *United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir.1992) (unsworn out-of-court statements by witness admissible in criminal prosecution where judge finds by a **preponderance of the evidence** that defendant threatened witness into not testifying at trial); *Steele v. Taylor*, 684 F.2d 1193, 1198–99, 1202 (6th Cir.1982), *cert. denied sub nom. Kilbane v. Marshall*, 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983) (where defendant procured the silence of a witness by cohabitating with her, defendant waived his right to object to admission of earlier statements that the witness made to law enforcement officials); *United States v. Thevis*, 665 F.2d 616, 633 n. 17 (5th Cir.), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) (in multi-count indictment, prosecutors who amended indictment to include charges of depriving witness of his civil rights by murder could introduce hearsay statement of deceased witness where judge finds by **clear and convincing evidence** that witness was murdered by defendant to procure his silence); *United States v. Balano*, 618 F.2d 624, 629 (10th Cir.1979), *cert. denied*, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980) (where court finds by **preponderance of the evidence** that the defendant coerced witness into silence by threatening his life, defendant waived his rights of confrontation and to make hearsay objections); *United States v. Carlson*, 547 F.2d 1346, 1358–59 (8th Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) (silencing of witness procured through threats of violence waives right to confront witness); *United States v. White*, 838 F.Supp. 618, 624–25 (D.D.C.1993) (where defendant indicted for murder of informant, informant's out-of-court statements to law enforcement officials admissible at trial where judge determines by **preponderance of the evidence** that defendant was responsible for informant's death). The First Circuit has never addressed this issue.

The Court need not determine whether to adopt this waiver theory, as the government now concedes such a theory is not applicable to the evidence it is proffering. The waiver theory is premised on the notion that the defendants procured the unavailability of the witness **in order to prevent him from testifying at trial.** Although it is true that whenever a person is killed, the murderer reaps the collateral benefit of preventing that person from testifying at a later trial, this in and of itself cannot be sufficient to invoke the waiver doctrine. Indeed, none of the cases permitting the use of the waiver doctrine to admit hearsay statements have gone this far. In this case, in contrast, the government's evidence at best *indicates* that Lynch, Fitzgerald, and Herd were out to get James Boyden Jr. not because he was cooperating with the government, but rather because he was selling drugs on Lynch's "turf." Indeed, the government maintains that James Boyden Jr. was killed because he ignored Fitzgerald's warnings that he should stop dealing drugs from Lynch's corner. Thus, the statements of James Boyden Jr. do not meet the test articulated by the cases cited above. *See, e.g., Thevis*, 665 F.2d at 633 n. 17 (for hearsay statement to be admissible, the government must prove that the defendant caused the unavailability of the witness "for the purpose of preventing that witness from testifying."). Nothing yet in evidence (or, apparently, to come) indicates that James Boyden Jr. was killed for purposes of preventing him from testifying at this, or any other, trial.

A related question is whether the waiver doctrine requires that an indictment or trial be pending at the time of the killing such that the killings took place "on the eve of trial." Defense counsel are correct in asserting that at the time of James Boyden Jr.'s murder, no charges were pending against Fitzgerald, Lynch, or Herd. Because the government does not even allege that Boyden was killed to prevent him from cooperating with the government, the Court need not address this issue here. This issue will be taken up with respect to the hearsay statements of James Boyden Sr. and George Sargent.

A few courts have admitted hearsay statements such as that proffered here based not on a waiver theory, but rather on the fact that such testimony is reliable and thus admissible under Rule 804(b)(5). *See United States v. West*, 574 F.2d 1131, 1137–38 (4th Cir.1978) (grand jury testimony of murdered government witness sufficiently reliable that its admission did not violate the confrontation clause); *Carlson*, 547 F.2d at 1357. In the wake of *Williamson v. United States*, — U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), at least one commentator suggests a possible expansion of this approach. G. Paul McCormack, *A Review of the 1993–94 Term: United States Supreme Court Case Summaries*, 18 THE CHAMPION 8, 14 (Nov.1994). The government did not raise this argument with respect to James Boyden Jr.

The government is to be commended for its judgment conceding a point it has no reasonable hope of winning, and likewise for declining to press on with a so-called "records analyst" when it became increasingly apparent that the so-called expert had nothing to contribute that went beyond the jurors' common sense. *Compare United States v. Montas*, 41 F.3d 775, 183–84 (1st Cir.1994) *with United States v. Echeverri*, 982 F.2d 675, 680 (1st Cir.1993). Perhaps the government can be forgiven, therefore, when, under the imperative of trial advocacy, it has advanced evidentiary propositions that, at best, can charitably be called inventive. See, e.g., the government's argument that, once a declarant had been threatened with death his later statements were admissible as "dying declarations" under Fed. R.Evid. 804(b)(2), 22 Trial Tr. 115–17 (Dec. 8, 1994), or its argument that the conduct of a defendant in attending the wake of a murder victim, expressing his sorrow, and kissing the victim's daughter was evidence of "consciousness of guilt" and thus an adoptive admission

however, seek to admit the statement of James Boyden Jr. to his sister that he intended to meet Herd as relevant circumstantial evidence that it was Herd who killed him later that evening. The government argued that this statement is admissible because it constitutes a statement of a then existing mental or emotional condition under Federal Rule of Evidence 803(3) ("Rule 803(3)"). Over objection, the Court admitted the statement and Marie Boyden Connors was allowed so to testify. This memorandum explains the Court's reasoning.

## II. ANALYSIS

■ This case presents an issue of first impression in the First Circuit, namely, whether the out-of-court statement of a victim-declarant of an intention to meet with a defendant on the evening of the victim's murder can be admitted at trial as circumstantial evidence of the meeting. Rule 803(3), commonly referred to as the "state of mind exception," excludes from the hearsay rule statements of "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)...." Thus, although the statement of James Boyden Jr. that he was going to meet Herd would clearly be admissible, if relevant, as a statement of James Boyden Jr.'s **own** intention, it is unclear whether it can be admitted against others—the defendants here—as evidence that the meeting **actually** took place.

### A. The Common Law Prior to Rule 803(3)

Prior to the adoption of the Federal Rules of Evidence, the Supreme Court addressed this issue in the famous case of *Mutual Life Insurance Co. of New York v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). In *Hillmon*, an insurance company sought to introduce out-of-court statements by a declarant, Walters, that he intended to travel with the insured, Hillmon. The hearsay

statement was used as the principal proof that Hillmon had actually traveled with Walters. In holding this statement admissible, the Supreme Court cited with approval *Hunter v. State*, 11 Vroom (40 N.J.L.) 495, 534, 536–38 (1878), a criminal case which involved facts similar to the case at issue here. In *Hunter*, the Court of Errors and Appeals (now the Supreme Court) of New Jersey held that a victim-declarant's out-of-court statements to his wife and son, just prior to his murder, that he was planning to meet with the defendant were admissible to prove the defendant's subsequent conduct. *See Hillmon*, 145 U.S. at 299, 12 S.Ct. at 914 (paraphrasing the *Hunter* case). The rationale of the New Jersey court was explicitly adopted by the Supreme Court in *Hillmon*. *Id.* Thus, under *Hillmon*, out-of-court statements of a declarant are admissible to prove the subsequent conduct of others.

The analysis, however, does not end here. In 1973, Congress codified *Hillmon* in Federal Rule of Evidence 803(3). The question for this Court, then, is whether in enacting Rule 803(3) Congress codified in full the reasoning of *Hillmon*, or whether it sought to limit the case's application.

### B. Rule 803(3) and its Legislative History

Rule 803(3) states that a declarant's out-of-court statement of intent is admissible at trial as an exception to the rule against hearsay. The text of the rule is silent as to whether such statements are admissible against third parties.

Unfortunately, the legislative history of Rule 803(3) only serves to obfuscate the analysis. While the Advisory Committee's Note to Rule 803(3) states that "the rule of *Mutual Life Insurance Co. v. Hillmon*, allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed," Fed.R.Evid. 803(3) advisory committee's note, *reprinted in* ERIC D. GREEN & CHARLES R. NESSON, FEDERAL RULES OF EVIDENCE 166 (1992) (citation omitted), the Report of the House Judiciary Com-

---

under Fed.R.Evid. 801(d)(2)(B). 22 Trial Tr. 121–24 (Dec. 8, 1994). While the Court rejected these arguments out of hand, the government

should understand that advancing them without any prior notice or briefing at times which interrupt the flow of evidence confuses the real issues and delays the trial.

mittee states that "the committee intends that the rule be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon*, so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person." H.R.REP. NO. 650, 93rd Cong., 1st Sess. (1973) (citation omitted), *reprinted in* 1974 U.S.CODE CONG. & AD.NEWS 7051, 7075, 7087. The Senate Report and the Conference Report are silent on this point.[2]

## C. Circuit Split

Courts that have had the opportunity to consider the application of Rule 803(3) are divided. *See Brown v. Tard*, 552 F.Supp. 1341, 1351–52 (D.N.J.1982) (noting that although under the New Jersey counterpart to Federal Rule 803[3] courts may admit a declarant's statement of intent to prove defendant's subsequent actions, federal courts are split on their interpretation of Rule 803[3] ).

*1. Second & Fourth Circuit Approach— Requirement of Corroborating Evidence—* Some courts have held that a declarant's statement of intent may be admitted against a non-declarant only when there is independent evidence connecting the declarant's statement with the non-declarant's conduct. *See United States v. Jenkins*, 579 F.2d 840, 842–43 (4th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978) (declarant's statement of intent is not admissible to prove subsequent conduct of third party, but is admissible to prove **why** third party acted as he did where there exists independent evidence that third party did in fact engage in the alleged conduct).

Similarly, the Second Circuit has held that "declarations of intentions or future plans are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declaration." *United States v. Nersesian*, 824 F.2d 1294, 1325 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *see also United States v. Delvecchio*, 816 F.2d 859, 863 (2d Cir.1987) (out-of-court statement of an informant that he intended to meet with the defendant was

not admissible to prove defendant's actual attendance at the meeting because the government offered no independent evidence of the defendant's presence); *United States v. Badalamenti*, 794 F.2d 821, 826 (2d Cir.1986) (out-of-court statement by declarant that he was going to meet defendant to obtain heroin was admissible so long as government proffered independent evidence that meeting actually took place); *United States v. Sperling*, 726 F.2d 69, 74 (2d Cir.), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984) (statements concerning declarant's state of mind are admissible against nondeclarant when linked with corroborating evidence); *United States v. Cicale*, 691 F.2d 95, 103–104 (2d Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983) (where defendant's participation in drug transaction was proven by eyewitness testimony, statements by co-conspirator that he was going to meet the defendant for purposes of engaging in drug transaction were admissible).

A district judge in the Northern District of Illinois has likewise adopted this approach. *See United States v. York*, No. 86 CR 315, 1987 WL 5938, at *7 (N.D.Ill. Jan. 12, 1987) (hearsay testimony held inadmissible where victim-declarant's statement that she intended to meet with the defendant at a particular time could not be corroborated with particularity). *But cf. Johnson v. Chrans*, 844 F.2d 482, 486 n. 4 (7th Cir.), *cert. denied*, 488 U.S. 835, 109 S.Ct. 95, 102 L.Ed.2d 71 (1988) (explaining that in some circumstances the Seventh Circuit has been willing to admit a declarant's out-of-court statements to prove conduct of another person, despite opposite result under Illinois state law).

*2. Ninth Circuit Approach—No Corroborating Evidence Necessary—*To the contrary, the Ninth Circuit has held that statements of a declarant's intent are admissible under Rule 803(3) to prove subsequent conduct of a person other than the declarant without corroborating evidence.[3] *See United*

---

2. This silence is revealing as it indicates that only one chamber of Congress (indeed, only one committee of that chamber) approved the limitation of the *Hillmon* doctrine urged by the defense.

3. According to one commentator, this was the majority position in 1982 among state and federal courts which had considered the issue. *See* Thomas A. Wiseman, III, Note, *Federal Rule*

*States v. Pheaster,* 544 F.2d 353, 374–80 (9th Cir.1976), *cert. denied sub nom. Inciso v. United States,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) (in kidnapping prosecution, trial court did not err in admitting testimony of a friend of the victim that shortly before the victim disappeared he told his friend that he was going to meet a person with the same name as the defendant). In holding statements of intent admissible against third parties, the *Pheaster* court recognized that such testimony could be unreliable, but rejected this as grounds for its exclusion. The Ninth Circuit explained that

> [t]he inference from a statement of present intention that the act intended was in fact performed is nothing more than an inference.... The possible unreliability of the inference to be drawn from the present intention [of the declarant] is a matter going to the weight of the evidence which might be argued to the trier of fact, but it should not be a ground for completely excluding the admittedly relevant evidence.

*Id.* at 376 n. 14. The court also acknowledged the "theoretical awkwardness" of applying a state of mind exception to prove conduct, but dismissed this objection because of the impressive array of authority favoring such application. *Id.* at 377.

After disposing of these arguments, the Ninth Circuit considered both the California counterpart to Rule 803(3) and the newly enacted Federal Rules of Evidence (which were not in force at the time of the trial below). The Ninth Circuit concluded that the *Hillmon* doctrine (allowing use of such testimony) remains undisturbed (1) because the text of the statute does not explicitly prohibit the use of declarant's statements of intent to prove the conduct of third persons, and (2) because of the contradictory nature of the legislative history of the rule. *Pheaster,* 544 F.2d at 379; *see also Terrovona v. Kincheloe,* 852 F.2d 424, 427 (9th Cir.1988) (out-of-court statement by victim to his girlfriend that he was leaving to meet the defendant was admissible because it was a state-

ment of declarant's then present intention and because it placed the defendant at the murder scene); *United States v. Astorga–Torres,* 682 F.2d 1331, 1335–36 (9th Cir. 1982), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982) (statement of declarant that he intended to bring guards with him to the site of a drug transaction was properly admitted as evidence of declarant's intent to actually bring such individuals, and when appropriate limiting instruction was given, inferences could be drawn by the jury as to whether guards were actually present).

## III. GROUND OF DECISION

■■■ As the Federal Rules of Evidence were enacted by Congress, this Court must interpret them as it would any statutory mandate. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993); *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 163, 109 S.Ct. 439, 446, 102 L.Ed.2d 445 (1988). In examining Rule 803(3) as a statute, we begin with the text. The language of Rule 803(3) clearly says that statements of intent are admissible. Thus, because it does not **by its terms** limit the class of persons against whom such statements of intent may be admitted, this Court rules that Rule 803(3) codifies *Hillmon* as written and does not disturb its conclusion or its reasoning.

The Court's holding is supported by examining Rule 803(3) in the context of the rest of the Federal Rules of Evidence. The Rules are replete with examples of Congress' familiarity with the concept of limited admissibility. *Compare* Fed.R.Evid. 803(3) *with* Fed.R.Evid. 404(a) (limiting circumstances in which character evidence may be admitted); Fed.R.Evid. 404(b) (limiting purposes for which evidence of other crimes, wrongs, or acts may be admitted); Fed.R.Evid. 407 (limiting purposes for which subsequent remedial measures may be admitted); Fed.R.Evid. 408 (limiting purposes for which compromises and offers to compromise may be admitted); and Fed.R.Evid. 411 (limiting purposes for which evidence of liability insur-

*803(3) and the Criminal Defendant: The Limits of the Hillmon Doctrine,* 35 Vand.L.Rev. 659, 687, 690 (1982).

ance may be admitted). Thus, had Congress intended to limit the admissibility of such statements, it presumably would have done so. This Court will not venture to graft a limitation where none exists.

 As Rule 803(3) is unambiguous,[4] this Court is unpersuaded by appeals to legislative history. *See Cabral v. INS*, 15 F.3d 193, 194 (1st Cir.1994) ("We look to the legislative history only if 'the literal words of the statute create ambiguity or lead to an unreasonable interpretation' "); *United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir.1987) (if the language of the statute is reasonably definite, it must be regarded as conclusive, and legislative history should not be consulted); *see also* OFFICE OF LEGAL POLICY, REPORT TO THE ATTORNEY GENERAL, USING AND MISUSING LEGISLATIVE HISTORY: A RE-EVALUATION OF THE STATUS OF LEGISLATIVE HISTORY IN STATUTORY INTERPRETATION iii–iv (1989) (it is inappropriate to look at legislative history if the meaning of statutory provision is plain). Even if the Court were properly to engage in an examination of Rule 803(3)'s legislative history, the conflicting nature of that evidence, **see supra,** would nevertheless lead us right back to the text. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412 n. 29, 91 S.Ct. 814, 821 n. 29, 28 L.Ed.2d 136 (1971) (where the legislative history is ambiguous the Court must consider only the statute itself to discern legislative intent). Therefore, such an inquiry is unnecessary.

Likewise, this Court is not persuaded by the decisions of the Fourth and Second Circuits requiring independent evidence before such testimony can be admitted. Indeed, this requirement is without foundation in ei-

ther the text or the legislative history of Rule 803(3). Thus, while the approach adopted by the Second and Fourth Circuits may seem practical and fair, it is really little more than judicial policymaking.[5]

This Court finds the decisions of the Ninth Circuit, with their emphasis on text and Supreme Court precedent, more persuasive. *See United States v. Pheaster*, 544 F.2d 353, 374–80 (9th Cir.1976), *cert. denied sub nom. Incisco v. United States*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *see also* Glen Weissenberger, *Hearsay Puzzles: An Essay on Federal Evidence Rule 803(3)*, 64 TEMP.L.REV. 145, 164 (1991) (describing assertions by a victim-declarant of intent to meet with defendant as "hybrid" statements of (1) intent to act, and (2) a belief that the other person will show up, that are admissible under Rule 803[3] ). *But cf.* Thomas A. Wiseman, III, Note, *Federal Rule 803(3) and the Criminal Defendant: The Limits of the Hillmon Doctrine*, 35 VAND.L.REV. 659, 705–707 (1982) (arguing that because of potential prejudice to criminal defendants, courts should reconsider their willingness to admit declarant's statement of intent against third parties).

Thus, James Boyden Jr.'s statement that he was going out "to meet Billy Herd" is admissible against Herd under Fed.R.Evid. 803(3). Although it is true that James Boyden Jr.'s statement of intent is only circumstantial evidence that he actually met Herd, this statement will be allowed to function as part of the larger array of evidence before the jury so that they may decide for themselves what weight—if any—to give Ms. Connors' testimony. *See Pheaster*, 544 F.2d at

---

4. One might argue that Rule 803(3) is ambiguous because on its face it provides no guidance as to whether it includes statements implicating the conduct of third parties. This, however, is a misunderstanding of the "plain meaning rule." Under this canon of construction, legislative history may only be consulted when the **meaning of the words** is in dispute; questions regarding the **application** of a statute to the facts of a particular case do not render a statute ambiguous. *See* OFFICE OF LEGAL POLICY, REPORT TO THE ATTORNEY GENERAL, USING AND MISUSING LEGISLATIVE HISTORY: A RE-EVALUATION OF THE STATUS OF LEGISLATIVE HISTORY IN STATUTORY INTERPRETATION iv (1989) (meaning of statute may be plain even where the application

of the statute is in dispute). Thus, despite ambiguity in the application of Rule 803(3), the text of the rule is in fact plain and the use of legislative history is therefore unwarranted.

5. It may be that the government will introduce corroborating evidence during the course of the trial. Therefore, the admissibility of the proffered evidence may not depend, as a practical matter, on the approach adopted by this Court. At this middle stage of the trial, however, this Court has admitted Boyden's statement of intent as relevant circumstantial evidence without any corroboration.

376 n. 14 (juries should be able to decide what weight to give a victim-declarant's assertion of intent to meet with defendant); *see also Cicale,* 691 F.2d at 104 n. 4 (articulating, but not adopting, the position that statements of intent should be allowed to function as part of a "larger matrix of circumstantial evidence").

## IV. CONCLUSION

For the reasons set forth above, on December 14, 1994, during the twenty-third day of trial, Marie Boyden Connors was permitted to testify, over timely objection, that as her brother James Boyden Jr. left her apartment for the last time, he said, he "was going to meet Billy Herd." [6]

---

**6.** She also testified that an alleged co-conspirator, Kevin Haugh, who was present at the same time, said the same thing as he left in company with James Boyden, Jr. The government makes the additional argument that Haugh's statement was "in furtherance of the conspiracy" and thus admissible under Fed.R.Evid. 801(d)(2)(E). While such a contention seems wholly illogical (why would a co-conspirator reveal to the sister of the intended victim the name of the alleged murderer to whom the victim was being delivered?), this Court eschews any mid-trial ruling on the existence or reach of any alleged conspiracy. The grounds discussed above provide an entirely sufficient basis for the admission of Haugh's hearsay statement.